MADDEN v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. December 10, 1898.)

Action by John Madden against the New York Central & Hudson River Railroad Company. The plaintiff was a brakeman in the employ of the defendant. He was injured while coupling cars at Canandaigua, N. Y., on the 22d day of March, 1892. This action was commenced in March, 1895, to recover damages for the alleged negligence of the defendant in permitting the use of a defective coupling apparatus which caused the injury. A trial was had in Cayuga county on the 11th of March, 1897, and at the close of the plaintiff's evidence the trial court granted the defendant's motion for a nonsuit; and, upon the plaintiff's application, his exceptions were ordered to be heard at the appellate division of

this court in the first instance. Frank C. Cushing, for plaintiff. Albert H. Harris, for defendant.

PER CURIAM. Plaintiff's exceptions overruled, and motion for a new trial denied, with costs, and judgment ordered for the defendant, with costs.

WARD, J. (dissenting). The plaintiff entered into the employ of the defendant in 1881, and worked as a section hand and brakeman for the company on the defendant's railroads from Canandaigua west until he was injured, on the 22d day of March, 1892, about 5 o'clock p. m. Canandaigua is the eastern terminus of what is called the "East Peanut Division," extending from Canandaigua to Batavia, and is an inspecting station for cars. It is also the northern terminus of the Northern Central Railroad, that road connecting at Canandaigua with the defendant's roads. Under the direction of the conductor of a train which was being made up at Canandaigua by shifting cars from various tracks of the defendant's road, the plaintiff was engaged in the work of coupling the cars which were being put into the train. The cars he was engaged in coupling were Northern Central cars classified under the Pennsylvania System. He was in the act of coupling a car that was standing still upon the track with a train of several others cars which was coming slowly down from the west to make the connection. They were not going faster than two miles an hour, being slower than a man walks. On one of the cars that was to be connected there were deadblocks upon the end sill. Upon the other there were not. The plaintiff knew nothing of these cars or of their coupling arrangements until he saw them in the act of coupling. The deadblocks consist of a piece of iron six or eight inches square, and placed on either side of the drawhead to act as a protection to the drawhead, and also for the man who couples; but deadblocks on end sills are not found on all the cars. On each of the cars to be coupled was a drawhead,—a spindle drawhead. The outer or exposed part of these drawheads extends eight or nine inches from the end sill, when in proper condition; and as the plaintiff was about to make the coupling he observed these drawheads, and they seemed to be in proper condition, and apparently all right for coupling. The spindle drawheads are made in two parts,—that part which projects beyond the end of the sill, and another part that is called the "stem." There is a double coiled spring around the stem. The head of the stem is inside the part that projects beyond the end sill. The coiled spring performs the office of extending and shortening the drawhead when it receives the force from the impact of two freight cars coming together. When the drawheads are in proper condition, and the coupling made in the manner that this was attempted, the spindle drawheads retire under the pressure from an inch to an inch and a half, so that the yielding of both drawheads would not lessen the space between the two cars to exceed three inches, which would leave a space from fourteen to fifteen inches between the end sills of the two cars when the coupling was effected. Upon the end car nearest the plaintiff as the train approached the standing car

another brakeman was sitting, adjusting the brake as it came to make the connection. The only witness who testified as to the accident was the plaintiff. He testified: "I set the brakes on this car which was placed on the main track [the stationary car]. After setting the brakes, I got down on the ground, preparatory to making the coupling of the following cars that were coming down the main track. * * * The cars were coming back slowly, and I proceeded to make the coupling. I took the ordinary position in making the coupling, proceeded to enter the link in the drawhead, and did so. After I did this, I saw the drawhead shoved in, and the cars came together, and I was squeezed through the body. The cars pressed so near together that they held me fast. After being caught in that position, I was held there until the slacking of the cars ahead forced me onto the rails and ties." I appears that, being released from this situation, he fell upon the track, and two wheels of the car passed over his right leg diagonally, and he was seriously injured. He also says: "I was caught through the small way of the body. The end sills were directly across my back and front." One other witness testified for the plaintiff as an expert. He was a foreman of car repairs of the Lehigh Valley Railroad Company, and had had large experience as such, and had had experience in repairing drawheads of freight cars for different roads and systems; and he testified: That the drawheads received the force from the impact of the two freight cars coming together. "That is what we rely upon to do that. The impact is thrown upon these springs. Q. To what extent does the outside part of this drawbar [drawhead]—the part through which the link goes, of these spindle drawbars—retire under the pressure of the impact of two cars coming together? A. It would depend upon the temper of the springs, a good deal. I should say that the normal is about an inch. From an inch to an inch and a half would be the distance a drawhead would retire under the pressure. I should think those figures express the limitation about that. The projection of the outside part of the spindle drawhead is about eight inches; that is, as it stands without any pressure being exerted upon it; eight inches beyond the end sill." On cross-examination, he testified: "Q. The amount of the play in one of these drawbars when the cars come together, or the distance that it would retire, depends a good deal on the force of the compact, doesn't it? A. Yes, sir. Q. How much play is allowed for in the construction of the drawbar? A. There is no play endways when the drawbar is properly put up. From side to side it has about an inch. It has a little play endways. You can put it up perfectly tight without its having a little play, but a drawhead, when it is put up in the right shape, has but very little play; that is, end to end,—endways. There is some,—a little. You can't get it perfectly. Q. In some cars the drawbar takes the place of the deadblock, doesn't it? A. Yes, but there is always the faceblock. There is an allowance made for the drawbar to retire.—give back. That allowance is about an inch and a half. Q. If the pressure is heavy, will it retire further than

that? A. Oh, yes; it is held in place by a spring. Q. I suppose, if that spring will allow it, or if the pressure is great enough, this drawbar may be pushed back several inches? A. No; not if the drawhead is put up in good shape. If it is in good order, I think about an inch and a half is the distance it would retire." The plaintiff testified that the drawhead on the standing car shoved in almost up to the end of the end sill, so that the other drawhead came closely up against it.

The defendant's motion for a nonsuit embraced three grounds: First, that the plaintiff had failed to show that the accident was caused by any negligence of the defendant; second, that he had failed to show himself free from contributory negligence; third, that it appeared that he received his injury while violating the rules of the defendant, and because of such violation.

The evidence does not disclose contributory negligence on the part of the plaintiff, unless it consisted of his failure to use the coupling stick, which will be considered hereafter.

The principal point urged to sustain the nonsuit, upon this review, was the first one (negligence of the defendant had not been shown). Coupling cars is perhaps the most dangerous duty imposed upon a railroad employé in the management of trains, and the care of the company and the employé should be commensurate with this danger. It is well settled that the railroad company should exercise reasonable care in providing safe coupling apparatus and appliances in the first instance, and in keeping them in repair. Bailey v. Railroad Co., 139 N. Y. 302, 34 N. E. 918; Goodrich v. Railroad Co., 116 N. Y. 398, 22 N. E. 397. And the employé has the right to assume that the coupling appliance is in good order, and that the company has performed its duty. Last case cited. And "when cars come to it from another road, which have defects visible or discernible by ordinary examination, it must either remedy such defects, or refuse to take them. This duty of examining foreign cars must obviously be performed before such cars are placed in trains upon the defendant's road, or furnished to its employés for transportation. When so furnished, the employés whose duty it is to manage the trains have a right to assume that, so far as ordinary care can accomplish it, the cars are equipped with safe and suitable appliances for the discharge of their duty, and that they are not to be exposed to risk or danger through the negligence of their employer." Id., 116 N. Y. 402, 22 N. E. 397. And see Gottlieb v. Railroad Co., 100 N. Y. 462, 3 N. E. 344; Durkin v. Sharp, 88 N. Y. 225; Seybolt v. Railroad Co., 95 N. Y. 562. In McDonald v. Railroad Co., 19 App. Div. 578, 46 N. Y. Supp. 600, the court says: "Although it did not appear how long these cars had been in the possession of the defendant prior to the accident, it owed a duty to its employés, before using, to inspect them, and was responsible for the consequences of such defects as could be discovered by ordinary inspection." Guided by the light of these cases, we will consider whether the plaintiff gave proof enough to have entitled his case to a submission to the jury upon the question of the de-

fendant's negligence; and, in considering this question upon this review, the most favorable view must be taken of the plaintiff's evidence in his behalf that it will justify. Hanover Nat. Bank of City of New York v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72. And the liability for negligence may arise from an inference from the facts proved as well as from the facts themselves. Seybolt v. Railroad Co., 95 N. Y. 567; Bailey v. Railroad Co., 139 N. Y. 306, 34 N. E. 919, where Judge Andrews says: "The evidence of the negligence of the defendant is not direct or positive, but this is an infirmity which attends the investigation of facts in courts of justice in very many cases. While a verdict founded upon inferences having no just basis in the proven facts ought not to stand, and where the grade of proof is such that the inference therefrom of an essential fact is a mere speculation, it is the duty of the court to withdraw the case from the jury, we are unwilling to say in this case that there was no evidence from which a just inference might not be drawn by the jury that the defective condition of the brake existed when the car left Norwood, and that there was a negligent failure to discover it at that point." The cars in that case had journeyed from Norwood to Dekalb Junction. The train having been stopped at the last station, it started again, with a view of placing it on a side track, moving upon a down grade. The plaintiff, in the performance of his duty, attempted to set the brake on the fourth flat car from the engine, and swayed upon the wheel in the usual manner, when the brake rod came out, and he was thrown from the car and injured by the moving train. On examination after the injury, it was found that the pin in the bottom of the brake rod, designed to hold the rod in place, was gone. There was no evidence how long this defective condition of the brake had existed. The plaintiff testified that the rod came out easily when he swayed upon it. The absence of the pin could not have been seen by one working the brake, but an inspection of the brake from under the car would have disclosed its absence. In the case at bar no inspection was shown of the Northern Central cars that the plaintiff coupled together. Had such inspection occurred, the burden was upon the defendant to have established it. The cars to be connected with the stationary car were properly and slowly moved to it, and there was no such force applied to the drawhead of the standing car as to have forced it in six inches, had that drawhead been in proper condition; and the inference is irresistible that it was not a proper appliance, or in a proper condition to perform its work. The jury might well have inferred that the coil of spring in that drawhead had become weak and unable to perform its functions from use, which time could only create. We think this case presents a stronger inference of defendant's negligence than the one from which we have just quoted, and that the court erred in not submitting that question to the jury. A proper inspection might have discovered the condition of this drawhead. That was for the jury to say.

Upon the cross-examination of the plaintiff, the defendant's counsel called out the fact that

in August, 1889, plaintiff received a coupling stick, and signed a paper which is as follows: "New York Central & Hudson River Railroad Co.: I hereby acknowledge the receipt of a coupling stick, and the notice regarding the use of the same coupling sticks, and that the provisions of the same are fully understood by me." The following is the notice referred to: "New York Central & Hudson River Railroad Co. Notice to Employés: In consequence of frequent injuries received by men engaged in coupling freight cars by thoughtlessly stepping too far between them, coupling sticks are provided for that purpose, which must be used instead of the hands. The company insists on a strict compliance on the part of the trainmen, yardmen, stationmen, and others requiring to do this service. Dispatchers will be furnished with sticks, on requisition on car shops, and by them furnished to conductors, train hands, and yardmen. Station agents will be furnished on requisition to division superintendents. A full supply must be kept constantly on hand." (Signed by the general superintendent, and dated November 1, 1885.) A rule of the company was introduced which embraced the provision in the notice as to the use of the coupling sticks. The coupling stick is a slight stick, about two feet long, and having a screw in the end. The plaintiff testified that those sticks were but little used, and could be used only to guide the link into the slot; that "the free hand must be used to insert the pin"; that it was not possible to insert the pin without going between the cars, and inserting the link with the hand; that, whether he used the stick or not, it was necessary for a trainman to go between the cars as he had done in effecting the coupling; that he had never made a coupling with the stick alone, and that it was not practicable to do it; and that the coupling stick was utterly useless where the drawheads did not come squarely together, which was the case in this instance. The duty was devolved upon the plaintiff to make the coupling, and make it effective, and take the risks necessary to accomplish it. The notice to the employé, and the rule itself, concede that it is necessary for the trainmen to step between the cars, but the suggestion is that they may step "too far" between the cars without the coupling stick. Had the rule forbidden the plaintiff to have stepped at all between the cars, and he had done so, even to obey the command of the master to make the coupling, another question would have been presented; but the evidence tended to show that, with or without the coupling stick, it was necessary for the plaintiff, in the discharge of his duty, to have gone between the cars as he did, and that question should have been submitted to the jury. Again, the injury to the plaintiff was caused by the defective drawhead, and his body coming between the cars as a result of that defect, which was the proximate cause of the injury; and the absence of the coupling stick was unimportant, as the jury may have found. Railroad rules, like all others, must be reasonably construed with reference to the object to be attained; and we are of opinion that as to what bearing the use of the coupling stick, or the failure to use it, had upon this case, was for the jury. The plaintiff's exceptions should be sustained, and a new trial granted, with costs to the plaintiff to abide the event.